## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TYRONE GREEN,** | : | **CIVIL ACTION NO. 1:13-CV-2978** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA, DEPARTMENT** | : | |
| **OF CORRECTIONS, BICKELL,** | : | |
| **SETTLE, TAYLOR, MORRISON,** | : | |
| **ECKARD GARMEN, HOLTZ,** | : | |
| | : | |
| **Defendants** | : | |

### MEMORANDUM

Plaintiff Tyrone Green ("Green"), a state inmate formerly incarcerated at the

State Correctional Institution at Huntingdon ("SCI-Huntingdon"), Pennsylvania,

commenced this civil rights action on December 12, 2013.  (Doc. 1).  The matter is

presently proceeding *via* an amended complaint.  (Doc. 17).  Named as defendants

are the Commonwealth of Pennsylvania Department of Corrections,

Superintendent Bickell, Deputy Superintendent Eckard, Lieutenant Taylor,

Lieutenant Holtz, Settle, Garmen and Morrison, past and present Pennsylvania

Department of Corrections ("DOC") employees assigned to SCI-Huntingdon.[1]  Ripe

for disposition is defendants' motion (Doc. 21) to dismiss Green's amended

---

[1] SCI-Huntingdon is identified as a defendant on the court's docket.  Upon review of the amended complaint, and Green's subsequent filings, it is clear that Green referenced the institution only to provide addresses for the individual defendants, and that he did not intend to name SCI-Huntingdon as a defendant.

complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, the motion to dismiss will be granted.

## I.    <u>Standard of Review</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept as true all [factual] allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  <u>Kanter v. Barella</u>, 489 F.3d 170, 177 (3d Cir. 2007) (quoting <u>Evancho v. Fisher</u>, 423 F.3d 347, 350 (3d Cir. 2005)).  Although the court is generally limited in its review to the facts contained in the complaint, it "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."  O<u>shiver v. Levin, Fishbein, Sedran & Berman</u>, 38 F.3d 1380, 1384 n. 2 (3d Cir. 1994); <u>see</u> <u>also</u> <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997).

Federal notice and pleading rules require the complaint to provide "the defendant notice of what the . . . claim is and the grounds upon which it rests." <u>Phillips v. Cty. of Allegheny</u>, 515 F.3d 224, 232 (3d Cir. 2008) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint in the face of a Rule 12(b)(6) motion, the court must conduct a three-step inquiry.  <u>See</u> <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step,

"the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"
Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal
elements of a claim should be separated; well-pleaded facts must be accepted as
true, while mere legal conclusions may be disregarded.  Id.; see also Fowler v.
UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009).  Once the well-pleaded factual
allegations have been isolated, the court must determine whether they are sufficient
to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550
U.S. at 556); Twombly, 550 U.S. at 555 (requiring plaintiffs to allege facts sufficient
to "raise a right to relief above the speculative level").  A claim "has facial
plausibility when the plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the misconduct alleged."
Iqbal, 556 U.S. at 678.

## II.   Allegations of the Complaint

Green alleges that he filed civil actions in the Court of Common Pleas of
Huntingdon County, see Civ. No. 06-1331, and in this court, see Green v Sneath, Civ.
No. 09-CV-0154, seeking relief for civil rights violations that allegedly took place
while he was incarcerated at SCI-Huntingdon and the State Correctional Institution
at Smithfield ("SCI-Smithfield").  (Doc. 17, ¶¶ 9-10).  Green further alleges that on
December 14, 2011, during the pendency of these lawsuits, defendant Settle and
other unknown personnel allegedly entered his cell to escort him from general
population to Administrative Custody ("AC"), for "purported investigative
purpose[s] memorialized to DC-141 Incident Report No.: 382640."  (Id. at ¶ 12).

Green avers that such a transfer "was required to be reviewed by Defendant Bickel [sic]." (Id. at ¶ 13).

Defendant Settle and other unknown personnel allegedly packed Green's personal property in records center boxes and removed the boxes from his cell without affording him the opportunity to inventory them. (Id. at ¶ 14). Between December 15, 2011, and December 19, 2011, while in AC, Green sent an inmate request form to defendant Taylor inquiring about the status of his personal property. (Id. at ¶¶ 16-17). On December 20, 2011, defendant Taylor allegedly responded that the property would not be returned. (Id. at ¶¶ 18-19).

Green claims that the Program Review Committee ("PRC") did not interview him or provide him with any information regarding incident report 382640, as required by prison policy. (Id. at ¶¶ 20, 22). Instead, defendants Eckard and Garmen interviewed him about a separate and distinct incident report which he allegedly received after he suffered a mental breakdown due to his "baseless placement and continued confinement in 'AC Status.' " (Id. at ¶ 21). On or about December 23, 2012, Green requested an interview with defendant Morrison, who allegedly was responsible for day-to-day operations. (Id. at ¶ 24). A corrections officer purportedly advised Green that "Lieutenant [Defendant] Morrison told me to tell you that Lieutenant Holtz said have a Merry Christmas in the hole." (Id.at ¶ 24). Green allegedly remained in AC over the Christmas holiday, preventing him from visiting with his family. (Id. at ¶ 25).

On December 28, 2011, Green was informed that he was being transferred to the State Correctional Institution at Forest ("SCI-Forest") and that he was required to sign his name to a DC-153 Inmate Property Receipt Form acknowledging that he inventoried his personal property. (Id. at ¶¶ 26-28). Green objected because he was not afforded an opportunity to inventory his property when it was packed and removed on December 14, 2011. (Id. at ¶¶ 26-30). The property officer noted that plaintiff refused to sign the DC-153 Inmate Property Receipt Form. (Id. at ¶ 31).

On December 29, 2011, Green was transferred to the SCI-Forest and placed in AC pending review by the PRC. (Id. at ¶¶ 32-33). During his PRC interview on January 5, 2012, he was informed that his Custody Level had been increased from Level 3 to Level 4. (Id. at ¶ 36). Allegedly, members of the PRC advised him that his Custody Level increased because SCI-Huntingdon officials "wanted to get rid of [him]." (Id. at ¶ 37).

At SCI-Forest, Green was released into general population which enabled him to receive visitors. (Id. at ¶ 38). He asserts, however, that his family was unable to visit him because of the significant distance between the institution and his hometown of Philadelphia. (Id. at ¶¶ 42-43). An SCI-Forest administrator reunited Green with his personal property, but Green asserts that a number of personal photographs were defaced "with inscriptive markings of racist connotation," and that other photographs and several hundred pages of legal documents were missing. (Id. at ¶¶ 39-41).

### III.   Discussion

#### A.   Constitutional Claims

In Count I, Green alleges that defendants Bickell, Settle, Taylor, Morrison, Eckard, Garmen, and Holtz retaliated against him for exercising constitutionally protected rights as guaranteed by the First Amendment, and denied him due process of law as guaranteed by the Fourteenth Amendment.  (Doc. 17, ¶¶ 47-50).

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).

##### 1.   First Amendment

The First Amendment offers protection for a wide variety of expressive activities.  See U.S. Const. amend I.  These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in

assessing the constitutionality of official conduct.  See Turner v. Safley, 482 U.S. 78, 89 (1987).  Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment.  See Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).  To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate:  (1) that he was engaged in constitutionally protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him."  Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001) (quoting Allah, 229 F.3d at 225).

With respect to the first and second Rauser prongs, "[a]lthough the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting—whether activity is 'protected' or an action is 'adverse' will depend on context.  Standing in his cell in a prison, an inmate is quite limited in what he can say; his government jailor can impose speech-limiting regulations that are 'reasonably related to legitimate penological interests.'  Turner, 482 U.S. at 89 (1987).  The fact that certain conduct of the plaintiff must be 'protected' in order to state a claim does not change with the setting—what changes is the type of conduct deemed protected in that particular setting."  Thaddeus-X v. Blatter, 175 F.3d 378, 388 (6th Cir. 1999).  The fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exercise of constitutional rights by inmates.  See Pell v. Procunier, 417 U.S. 817, 822-

23 (1974).  Thus, a prison inmate "retains [only] those rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  Id. at 822.

Defendants concede that Green has met the first and second prongs of the Rauser test.  (Doc. 22, pp. 11-12).  Green's actions that purportedly incited retaliation--pursuing litigation against Pennsylvania Department of Corrections personnel--falls within the ambit of conduct protected by the First Amendment, thus satisfying the first prong of the Rauser test.  See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir.  2003).  As to the second prong, plaintiff alleges that he suffered adverse action in the form of compelled placement in AC.  As defendants properly acknowledge, confinement in administrative custody constitutes adverse action. Allah, 229 F.3d at 225.

The third prong requires the court to determine whether there is a causal connection between the exercise of the constitutional right and the adverse action. The plaintiff must show that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action.  This "motivation" factor may be established by alleging a chronology of events from which retaliation plausibly may be inferred.  Tighe v. Wall, 100 F.3d 41, 42 (5th Cir. 1996); Goff v. Burton, 91 F.3d 1188 (8th Cir. 1996); Pride v. Peters, 72 F.3d 132 (Table) (7th Cir. 1995).  It is plaintiff's burden to prove that defendants were motivated by retaliation.  Hannon v. Speck, No. 87-3212, 1988 WL 131367, at *4 (E.D. Pa. Dec. 6, 1988) (stating that "[i]n bringing a § 1983 action alleging such retaliation, an inmate

faces a substantial burden in attempting to prove that the actual motivating factor . . . was as he alleged.").

Where a prisoner seeks to establish this causal link based upon the temporal proximity between the protected conduct and the alleged retaliatory act, "the timing of the alleged retaliatory action must be unusually suggestive before a causal link will be inferred." Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997); Rauser, 241 F.3d at 334; see also Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (concluding that the temporal proximity, nearly six months, is not unduly suggestive and does not sufficiently establish any causal link). Courts have rebuffed efforts to infer causation from temporal proximity when a span of weeks or months separated the constitutionally protected conduct from the alleged acts of retaliation.  See Killen v. N.W. Human Servs., Inc., No. 06–4100, 2007 WL 2684541, at *8 (E.D.Pa. Sept.7, 2007) (holding that temporal proximity of seventeen days was insufficient to establish causation); see also Farrell v. Planters Lifesavers, Co., 206 F.3d 271, 279 n. 6 (3d Cir. 2000) (suggesting that temporal proximity of seven weeks would be insufficient to establish causation); Smith v. ABF Freight Sys., Inc., No. 04–2231, 2007 WL 3231969, at *11 (M.D.Pa.Oct.29, 2007) (holding that temporal proximity of one and one-half months was insufficient to establish causation); Mar v. City of McKeesport, No. 05–19, 2007 WL 2769718, at *4 (W.D.Pa.Sept.20, 2007) (holding that temporal proximity of three months was insufficient to establish causation)." Fischer v. Transue, No. 04–2756, 2008 WL

3981521, * 10 (M.D.Pa. Aug.22, 2008) (holding that temporal proximity of three weeks was insufficient to establish causation).

Defendants argue, and the court agrees, that Green's retaliation claim fails because he cannot establish a causal connection between the filing of his civil actions and his placement in AC, either directly or by temporal proximity. Review of the docket entries for his federal case, 1:09-CV-0154, reveals that, at the time of the transfer, the action had been pending for more than twenty-two months and trial of the matter had been postponed due to pending cross-motions for summary judgment.  Notably, the docket is devoid of any indication that Green or defendants filed any documents in his federal case during the three months prior to his December 14, 2011 placement in AC.  Hence, Green cannot establish a causal connection between pursuit of his federal action and the alleged retaliatory action. Nor can Green establish causation based on the state court matter.   The state court action was filed in 2006, more than five years prior to the transfer date. (Doc. 26, pp. 3-10).  It was actively litigated through January 13, 2009.  (Id. at 5-8).  It then remained idle for years.  On November 8, 2011, the following docket entry appears: "In light of new evidence plaintiff seeks leave to reassert claim of negligence and to add new defendants with proof of service, filed." (Id. at 8).  This filing occurred five weeks prior to the transfer and, standing alone, it is insufficient to establish any causal link.  Further, it is not unduly suggestive in that it simply appears to be an effort to revive a stagnant claim.  For all of these reasons, defendants' motion to dismiss Green's retaliation claim will be granted.

2.      Fourteenth Amendment

The Fourteenth Amendment of the United States Constitution provides, in pertinent part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ."   The due process analysis starts with determining whether the liberty interest asserted is one that is protected by the Fourteenth Amendment.  Montanez v. Sec'y Dep't of Corr., 773 F.3d 472, 482 (3d Cir. 2014) (quoting Evans v. Sec'y Pa. Dep't of Corr., 645 F.3d 650, 663 (3d Cir. 2011)); Fraise v. Terhune, 283 F.3d 506, 522 (3d Cir. 2002).

a.      *Administrative Custody*

The court's due process inquiry is whether the state action resulted in an "atypical and significant hardship" on the plaintiff-inmate:

> In Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed. 2d 418 (1995), the Supreme Court announced a new standard for determining whether prison conditions deprive a prisoner of a liberty interest that is protected by procedural due process guarantees. Although the Court acknowledged that liberty interests could arise from means other than the Due Process Clause itself, the Court concluded that state-created liberty interests could arise only when a prison's action imposed an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' 515 U.S. at 483, 115 S.Ct. 2293  ...  In finding that the prisoner's thirty-day confinement in disciplinary custody did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest, the Court considered the following two factors: 1) the amount of time the prisoner was placed into disciplinary segregation; and 2) whether the conditions of his confinement in disciplinary segregation were significantly more restrictive than those imposed upon other inmates in solitary confinement.  Id. [at 486, 115 S.Ct. 2293].

Shoats v. Horn, 213 F.3d 140, 143-44 (2009).  Placement in prison disciplinary or administrative segregation will implicate a protectable liberty interest only if it dramatically departs, in length of time or otherwise, from basic prison conditions. See, e.g., Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002) (seven months in disciplinary segregation is insufficient to trigger a due process violation); Griffin v. Vaughn, 112 F.3d 703, 706-07 (3d Cir. 1997) (fifteen months in administrative custody is insufficient to trigger a due process violation).   Confinement in administrative or punitive segregation is insufficient, without more, to establish the kind of "atypical" deprivation of prison life necessary to implicate a liberty interest. Sandin, 515 U.S. at 486; see Griffin, 112 F.3d 706-07.

Green's confinement to administrative custody for approximately twenty-one days is not a significant departure in length of time from basic prison conditions.  In addition, the denial of visiting privileges is insufficient to state a due process claim as prisoners do not have constitutionally protected interests in prison visitation. See Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989); Block v. Rutherford, 468 U.S. 576, 588 (1984).  Green's limited confinement to administrative custody, albeit during the Christmas holiday, is not the atypical or significant deprivation that would give rise to a liberty interest under Sandin.

b.      *Transfer*

Green's claim that his due process rights were violated when he was transferred from SCI-Huntingdon to SCI-Forest, and was assigned an increased custody level, also fails.  An inmate does not have a justifiable expectation that he will be incarcerated in a particular prison.  See Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Montanye v. Haymes, 427 U.S. 236, 242 (1976). Nor does the United States Constitution confer any right upon an inmate to any particular custody or security classification.  Moody v. Daggett, 429 U.S. 78, 88 (1976); Montanye, 427 U.S. at 242.

c.      *Personal Property*

Green alleges that, when his personal property was returned he noticed that a number of personal photographs were defaced, and other photographs and several hundred pages of legal documents were missing.  Deprivation of inmate property by prison officials, whether intentional or negligent, does not give rise to a cognizable due process claim if the prisoner has adequate post-deprivation remedies available under state law.  See Daniels v. Williams, 474 U.S. 327, 328 (1986) (holding negligent acts of officials causing unintentional losses of property do not implicate due process); Hudson v. Palmer, 468 U.S. 517, 533 (1984) (finding intentional deprivations of property do not violate due process if a meaningful post-deprivation remedy for the loss is available); see also 42 PA. CONS.STAT. ANN. § 8522(a), (b)(3) (common law action for conversion);  Adequate remedies were

available as Green had access to the prison administrative review process. <u>Tillman v. Lebanon Cnty. Corr. Facility</u>, 221 F.3d 410, 422 (3d Cir. 2000) (finding that inmate had an adequate post-deprivation remedy in the form of the prison grievance program).  Moreover, if Green was dissatisfied with the outcome of the administrative process, he then had the option to pursue the matter in a state court tort action. <u>Hudson</u>, 468 U.S. at 535.   The claim is therefore subject to dismissal.

### B.    State Law Claims

In Count II, Green alleges that defendants Bickell, Taylor, Morrison, Holtz and Settle negligently handled personal property.  (<u>Id.</u> at ¶¶ 53, 54).  In Count III, he asserts that the Pennsylvania Department of Corrections was negligent and "is liable for the respective actions of said Defendants by virtue of the doctrine of respondeat superior." (<u>Id.</u> at ¶ 59).  "Supplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims when they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." <u>Wisconsin Dept. of Corrections v. Schacht</u>, 524 U.S. 381, 387 (1998) (citation and internal quotation marks omitted).  "A district court can decline to exercise supplemental jurisdiction in several circumstances, including a situation where 'the district court has dismissed all claims over which it has original jurisdiction,' as in this case." <u>Trinity Industries, Inc. v. Chicago Bridge & Iron Co.</u>, 775 F.3d 131, 135 (3d Cir. 2013) (quoting 28 U.S.C. § 1367(c)(3)).  Because all original subject matter jurisdiction claims are being dismissed, the court declines to exercise supplemental jurisdiction over

Green's state law claims pursuant to 28 U.S.C. § 1367(c)(3).  See Taggart v. Norwest Mortg. Inc., 539 F. App'x 42, 45 (3d Cir. 2013).

## IV.    Leave to Amend

A court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 110–111 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 117 (3d Cir. 2000).  Given the basis of dismissal of Green's claims, affording an opportunity to amend would be futile.

## V.    Conclusion

For all of the reasons set forth in this memorandum, defendants' motion (Doc. 21) to dismiss will be granted in its entirety.

An appropriate order will issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:        March 12, 2015